FAX or Internet

UNITED STATES DISTRICT COURT

for the

District of Arizona

In the Matter of the Search of

**A black iPhone 11 Pro Max cell phone, IMEI number is 352852115217141, Serial number FK1DC9EPN70C**

)
)
)
)
)

Case No.   23-04281 MB

## ELECTRONICALLY ISSUED SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer.

An electronic application by a federal law enforcement officer for the government requests the search of the following person or property located in the _____ District of   Arizona _____
*(identify the person or describe the property to be searched and give its location)*:  **See Attachment A.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal:  **See Attachment B.**

**YOU ARE COMMANDED** to execute this warrant on or before        November 2, 2023
                                                                                                          *(not to exceed 14 days)*

☐ in the daytime  6:00 a.m. to 10 p.m.      ☒ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the search warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave a search warrant copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge
    Any U.S. Magistrate Judge in the Dist. of Arizona    .
                    *(Name)*

☐ I find that immediate notification may have an adverse result as specified in 18 U.S.C. § 3103a (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*     ☐ for _____ days *(not to exceed 30)*.
                                                                                 ☐ until, the facts justifying, the later specific date of _____.

Date and Time Issued:   October 19, 2023 at 1:25 p.m.          _____
                                                                                                        *Judge's Signature*

City and State:    Flagstaff, Arizona          Camille D. Bibles, United States Magistrate Judge

| Return | | |
|---|---|---|
| Case No.:<br>      23-04281 MB | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

| Certification |
|---|

    I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____        _____
                                                                    *Executing Officer's Signature*

                                                 _____
                                                                    *Printed Name and Title*

## ATTACHMENT A

### Property to be Searched

**Description:**  The cellular phone to be searched, which is referred to as "DEVICE," is an Apple iPhone 11 Pro Max cellular smartphone, Model Number MWGF2LL/A, Serial number FK1DC9EPN70C. The DEVICE is black with a touch screen encompassing the front of the DEVICE. The back of the DEVICE is black with a black protective case and a red and silver phone grip. The IMEI number is 352852115217141. To the extent applicable, the DEVICE includes all physical electronic storage devices attached to the DEVICE such as an SD card, MicroSD card, or and/or SIM Card that can be utilized to store the above.

**Location:**  The DEVICE is secured in evidence at the National Park Service offices, located at the Investigative Services Branch, Grand Canyon, Arizona, which is in the District of Arizona.

**Photos:**





This warrant authorizes the forensic examination of the DEVICE for the purpose of identifying the electronically data particularly described in Attachment B. Electronic data includes evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic or video form.

## ATTACHMENT B

### Things to be Searched for and Seized

1.     An Apple iPhone 11 Pro Max, model number MWGF2LL/A, serial number FK1DC9EPN70C, IMEI number 352852115217141 (the "Device")

2.     All contents, data, photographs, video recordings, records, and information and records from the Device that relate to violations of 18 U.S.C. § 1801 (video voyeurism), including specifically:

        a.     Any photographs and/or video recordings of John Doe.

        b.     Any photographs and/or videos depicting any person urinating and/or defecating.

        c.     Any photographs, video recordings, messages of any type (including instant messages and text messages), records, information, and/or any other evidence of usage, which are on the Device from October 8, 2023.

        d.     Any photographs and/or videos that depict the area at and/or near the Yaki Mule Barn at the Grand Canyon National Park from October 1, 2022,  to October 8, 2023.

        e.     Any records, information, depictions and/or evidence of voyeurism, including videos, recordings, photographs, digital literature, digital drawings, and/or pornographic images of voyeurism (e.g., nude or semi-nude photographs or videos that were taken or appear to have been taken surreptitiously). This may include depictions of a person's genitalia, buttocks, breasts, naked or undergarment clad genitals, and/or private area of the individual, and depictions of people urinating and/or people defecating. Such depictions may be stored in a dedicated file for photographs and/or videos and/or may be (among other places on the Device) in instant messages, text messages and/or emails, and/or in records of internet activity, including firewall logs, caches, deletion folders, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that were entered into any internet search engine, and records of user-typed web addresses.

3.     Indicia of ownership and/or use of the Device, which may include things such as the owner and/or the user's name, which is believed to be Terry Jean (JEAN).  This may include such things as user's, owner's, and/or JEAN's name used in conjunction with the Device (e.g., information in the contacts, saved usernames and passwords, logs, registry entries, configuration files, documents, browsing history, user profiles, instant messaging logs, texts, and emails) and/or specifically using JEAN's name and/or identifying him as the owner and/or user of the Device. Indicia also may include subscriber information pertaining to the individual accounts and/or identifiers, including subscribers' full names, addresses, ESN (Electronic Serial Number), IMEI (International Mobile Equipment Identifier) or other unique

identifiers for the wireless device associated with the Device, contacts stored or accessed on the Device, photographs and/or video recordings of JEAN, and other identifiers associated with the Device.

4.     Evidence that establishes how the Device was used, and the purpose of its usage, which may include: text and multimedia messages stored and contained within the Device; photographs, videos and audio; log files, messaging logs, records of session times and durations, dates and times of connecting to the internet, and methods of connecting, telephone numbers associated with outgoing, missed, and incoming calls; and stored and/or accessed contacts.  Any information showing and/or depicting the location and/or time stamp of a particular, photograph, video, and/or document. Evidence of usage also may include evidence of voyeurism itself (e.g., surreptitious photographs and/or videos).  The search for such things in this paragraph will be limited (to the extent possible) from October 1, 2022,  to October 8, 2023.

5.     Contextual information necessary to understand the evidence, to identify the user/possessor/owner of the Device, to understand the operating and processing systems and storage mediums, and to establish admissibility of the evidence in subsequent legal proceedings will also be sought in the search.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic or video form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the NPS may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

Unless further permission is sought from the Court, the Device will be imaged (to the extent possible) and/or searched for the things described above within the next 90 days. (In some cases, there may be difficulties in opening a phone due to security protocols of passwords. In such a case, additional time may be sought from the Court to access the device).

FAX or Internet

# United States District Court
for the
District of Arizona

| In the Matter of the Search of: | |
|---|---|
| **A black iPhone 11 Pro Max cell phone, IMEI number is 352852115217141, Serial number FK1DC9EPN70C** | )<br>)<br>)<br>)    Case No.  23-04281 MB |

## ELECTRONICALLY SUBMITTED APPLICATION FOR SEARCH WARRANT

I, the undersigned, a federal law enforcement officer, request an electronic search warrant and state under penalty of perjury that I have reason to believe that on and within the following person or property:

**See Attachment A.**

located in the _____ District of _____Arizona_____ , there is now concealed:

**See Attachment B.**

The basis for the search under Fed. R. Crim. P. 41(c) is:

- [X] evidence of a crime;
- [X] contraband, fruits of crime, or other items illegally possessed;
- [X] property designed for use, intended for use, or used in committing a crime;
- [ ] a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section(s)* | *Offense Description(s)* |
|---|---|
| 18 U.S.C. § 1801 | Video Voyeurism |

The application is based upon the following facts:

- [X] Continued on the attached sheet (see attached **Affidavit**).
- [ ] Delayed notice of ____ days (give exact ending date if more than 30 days _____ is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by: *AUSA Paul V. Stearns*
**Pursuant to 28 U.S.C. §1746(2), I declare under penalty of perjury that the foregoing is true and correct.**

Executed on: October 19, 2023

_X_ Sworn by Telephone
Date/
Time:    October 19, 2023 at 1:25 p.m.

City and State:   Flagstaff, Arizona

PHILIP OAKES   Digitally signed by PHILIP OAKES
Date: 2023.10.18 21:56:04 -07'00'

*Applicant's Signature*

Philip Oakes, Special Agent, NPS
*Printed Name and Title*

*Judge's Signature*

Camille D. Bibles, United States Magistrate Judge
*Printed Name and Title*

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

**ELECTRONICALLY SUBMITTED AFFIDAVIT**

I, NPS Special Philip Oakes, state under oath as follows:

1.      I am a Special Agent (SA) with the National Park Service (NPS),
United States Department of the Interior.   I am presently assigned to the
Intermountain Region, duty stationed at Grand Canyon National Park.  I have been
employed by the NPS since 2007, and I have worked in the role of Special Agent
and as a U.S Park Ranger in Colorado, Texas, Washington, and Arizona.  Prior to
working with the NPS, I was a Law Enforcement Ranger with the City of Boulder,
Colorado, from April 2004 until October 2006.  I have received training at the
Federal Law Enforcement Training Center, completing the Land Management
Police Training and the Land Management Investigator Training Program.  I have
attended numerous training courses in a variety of law enforcement subjects and
have conducted criminal investigations into a variety of offenses.

2.      The information contained in this affidavit is from my personal
knowledge, training, and experience, and from information provided to me by other
law enforcement officers and/or witnesses including those listed herein.  Because
this affidavit is made to establish probable cause, I have not listed each item and
every fact known regarding this investigation.

## **Introduction**

3.      This case involves an investigation into video voyeurism that occurred in a wooded area behind a shed at the Yaki Mule Barn, within Grand Canyon National Park, in the District of Arizona.  The Grand Canyon National Park is an area within the special maritime and territorial jurisdiction of the United States.   The incident occurred on October 8, 2023, and pertains to a violation of 18 U.S.C. § 1801.[1]  The suspect in the video voyeurism is Terry Jean (JEAN), who is an adult (56-year-old) male employee of Xanterra, which is a concessionaire in the Grand Canyon National Park.

4.      This affidavit supports the application for a search warrant for a cellular phone device that is particularly described in Attachment A.  The cellular phone is an Apple iPhone 11 Pro Max, model number MWGF2LL/A, serial number FK1DC9EPN70C, IMEI number 352852115217141 (the "Device").  The Device is black with a "touch screen" encompassing the front of the phone. The Device is in a black OTTERBOX case with a silver and red phone grip on the back of the case. The Device is secured in evidence at the NPS offices, located at the Investigative Services Branch (ISB), Grand Canyon, Arizona, which is in the District of Arizona.

---

[1] In pertinent part, 18 U.S.C.§ 1801(a), states:  "Whoever, in the special maritime and territorial jurisdiction of the United States, has the intent to capture an image of a private area of an individual without their consent, and knowingly does so under circumstances in which the individual has a reasonable expectation of privacy, shall be fined under this title or imprisoned not more than one year, or both."

5.      The things to be searched for and seized from the Device are described below and more particularly in Attachment B.

## **Investigation**

6.      On October 8, 2023, at approximately 11:15 a.m., the Grand Canyon Regional Communications Center received a report of an incident of voyeurism at the Yaki Mule Barn, located near the South Kaibab Trailhead, within Grand Canyon National Park. The reporting party, D.B., a family on one of the morning mule rides, reported that JEAN video recorded one of them while they used the restroom. The victim was later identified as a 16-year-old male, John Doe.

7.      According to John Doe, he and his family – which included his mom (H.Z.), his dad (G.Z.), and his younger brother –  went on a mule ride this morning (i.e., October 8, 2023). The trip started at the Yaki Mule Barn. A man who people seemed to call "Hoop" or "Hooper" identified himself as a supervisor. John Doe described the supervisor as having dark skin and dark hair. He wore glasses, a button-down shirt, cowboy hat, and jeans. John Doe stated that Hoop or Hooper looked like he was either Native American or of Latin American, and he was later identified by employees at the mule barn as JEAN.  JEAN stayed behind at the barn and corral area while a wrangler, T.C., led the group on a ride that went along the rim for about an hour and then returned the same way.  The trip ended at the Yaki Mule Barn. A little over halfway into the ride, John Doe had to use the restroom (i.e., he needed to urinate). There was no opportunity during the ride so when they

3

returned, he needed to urgently use a restroom. John Doe was the first one in the group to get off his mule with help from JEAN. When John Doe asked where the restroom was, JEAN pointed in the direction of the South Kaibab Trailhead restroom and said there was one, but it was a long way to get to it. Then JEAN pointed to an old shed and said John Doe could go to the bathroom behind the shed. John Doe said it seemed like it was an area often used for a make-shift restroom for both mule wranglers and clients.

8.     John Doe said that he followed JEAN's directions and walked behind a brown shed, unzipped his pants, and began to urinate while facing the back of the shed. While urinating, John Doe looked to his left and noticed a black cell phone in a nearby tree branch with its camera lens pointed at him. John Doe walked over to the cell phone, looked at the screen, and realized it had been video recording. John Doe watched the video. At the beginning of the video, John Doe saw a dark-skinned arm setting up the camera. The video camera was focused on the area behind the shed, and, for some time, there was no one in the frame of the camera.  John Doe saw himself on the video walk to the designated area behind the shed, unzip his pants, and urinate. John Doe saw that the video captured a fully frontal and clear view of his genitals. John Doe stopped the video and scrolled through other photos on the camera roll. He immediately recognized several photos of JEAN riding a horse and with what appeared to be friends.  John Doe also saw a notification on the phone indicating that a cloud storage linked to an email address was full.  John Doe

said the email address was something like tjean@gmail.com or tjeanhoop@gmail.com.

9.     John Doe took the phone, walked out from behind the shed, and got H.Z.'s attention. John Doe told his mother (H.Z.) what happened and showed her the video. H.Z. and John Doe deleted the video without thinking. Based on his own knowledge, John Doe thinks the video would still be in the recently deleted file on the Device.  John Doe pointed at JEAN and said the phone belonged to him.

10.    According to H.Z., after John Doe showed her the video, she was trying to process all the information and was having a hard time. H.Z. confirmed she saw the video depicting John Doe's genitals. H.Z. approached JEAN and told him about the incident. JEAN said he would take care of it, and he took the cell phone from H.Z. In hindsight, H.Z. said she was not thinking straight and approached JEAN because he was the supervisor there at the time.  H.Z. regrets talking with JEAN and allowing him to take the phone. After taking the phone, JEAN immediately put the phone in his breast pocket, turned around, and walked away toward the mule corral.

11.    According to John Doe's father (G.Z.), after H.Z. and John Doe told him what happened, G.Z. observed JEAN "meandering" between the still saddled mules in the corral.  G.Z. said that it looked like JEAN was stalling because he was not really doing anything other than slowly walking around. At some point, G.Z. noticed the cell phone disappeared from JEAN's front breast pocket on his shirt to a rear pocket on his jeans. JEAN continued to wander around the corral and then into

a larger enclosure for the mules. G.Z. said eh lost sight of JEAN's hands and the cell phone multiple time during the "meandering." At some point, G.Z. approached JEAN and asked him where the phone was located. JEAN responded, "I don't know what you're talking about." G.Z. said he saw H.Z. give the phone to JEAN and now he wanted to know where it was located. JEAN replied, "I don't have a phone." Then G.Z. tried to encourage JEAN to "do the right thing" and give his boss, D.B., the phone. JEAN only gave vague responses and walked away.

12.    According to D.B.'s statement that was provided to NPS Ranger Nicholas Mann, D.B. approached JEAN and tried to find out where the phone was located.  JEAN pulled a phone out of his pocket and said, "This is my phone."  Then John Doe started to yell, "That's the phone!"  JEAN put the phone back into his pocket and walked away. After calling 911, D.B. approached JEAN again and asked where the phone was but JEAN said he did not have a phone. D.B. said he saw the phone and asked again where the phone was at; however, JEAN would not answer.

13.    The Device is currently secured in evidence at the NPS ISB offices in the Grand Canyon National Park.  It came into the NPS' possession in the following way: According to D.B.'s statement and statements made by United States Park Ranger (USPR) Ryan McDonald-O'Lear, they walked around the mule enclosure looking for the Device.  D.B. said, "I spotted the phone on the bottom of an I-beam facing away from the barn."  USPR McDonald-O'Lear said the Device was located at the base of an I-beam pillar located in the middle of the other pillars on one side

of an open shade structure. The Device was resting upright, stuck behind a large screw, and sticking up from the base of the pillar on the side facing away from where the employees and the family were gathered. USPR McDonald-O'Lear seized the Device as evidence and transferred it to NPS SA Abby Confer.

14. While logging the Device into evidence, SA Confer observed the following. The Device was powered on with the lock screen illuminated. The Device was not password protected. Per NPS standard operating procedure, SA Confer went into the "Settings" app to put the Device into airplane mode, turned off Wi-Fi and Bluetooth, and disabled Location Services. While in the "Settings" app, SA Confer saw JEAN's name listed on the Device as the owner. SA Confer collected the necessary identifying information from the Device.

15. On October 12, 2023, NPS SA Abby Confer received the following information from Xanterra South Rim, LLC human resources employee Carlos Torres, through Xanterra Chief Legal Officer Trey Overdyke (collectively, "Xanterra").

16. According to Xanterra, JEAN was first hired by Xanterra South Rim, LLC in August 2011 as a Trail Guide II. JEAN worked in this position until December 2012 when he was promoted to Livery Supervisor. JEAN resigned from the Livery Supervisor position in April 2022 to pursue other employment.

17. According to Xanterra, in October 2022, JEAN was re-hired by Xanterra South Rim, LLC, into a Trail Maintenance Crew position. In May 2023,

JEAN was promoted to Livery Supervisor. This was the position he occupied on October 8, 2023.

18.    According to Xanterra, on October 8, 2023, JEAN was scheduled to work a shift from 6:30 am to 3:30 pm.

19.    According to Xanterra, JEAN received two discipline notices during his time working for Xanterra South Rim, LLC. Xanterra South Rim, LLC issued one discipline notice to JEAN in 2019 for clocking in early. Xanterra South Rim, LLC issued a second discipline notice to JEAN in 2020 for losing his keys. Xanterra South Rim, LLC did not have any record of employee or guest complaints against JEAN.

20.    According to Xanterra, JEAN has not worked at any other Xanterra properties.

## **Technical Terms and Issues Related to the Device**

21.    Based on my training and experience, the following technical terms are used to convey the following meanings:

a.    Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls

made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

   b.   Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

   22.   Based on my training, experience, research, and from consulting the manufacturer's product information and technical specifications available online at https://support.apple.com/kb/SP806?locale=en_US, the Device has capabilities that allow it to serve as a wireless telephone, digital camera, digital video recorder,

portable media player, global positioning system (GPS) navigation device, personal digital assistant (PDA), and personal computer with internet capabilities. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

### Things to Be Searched for and Seized/Search Protocols

23.     I am seeking to search and seize the Device described in Attachment A for evidence pertaining to violations of 18 U.S.C. § 1801, video voyeurism, as described further below.  Such things may include evidence of the crime of voyeurism itself (e.g., surreptitious photographs and/or videos) – including any video recordings of John Doe or others using the makeshift "restroom" behind the shed described above – but also includes evidence that may support intent and knowledge (e.g., other acts of voyeurism and/or depictions of people urinating and/or defecating).

24.     Under 18 U.S.C. § 1801, "the term 'capture', with respect to an image, means to videotape, photograph, film, record by any means, or broadcast;" "the term 'broadcast' means to electronically transmit a visual image with the intent that it be viewed by a person or persons;" "the term 'a private area of the individual' means the naked or undergarment clad genitals, pubic area, buttocks, or female breast of that individual;" "the term 'female breast' means any portion of the female breast below the top of the areola;" and "the term 'under circumstances in which that

individual has a reasonable expectation of privacy' means— (A) circumstances in which a reasonable person would believe that he or she could disrobe in privacy, without being concerned that an image of a private area of the individual was being captured; or (B) circumstances in which a reasonable person would believe that a private area of the individual would not be visible to the public, regardless of whether that person is in a public or private place."  18 U.S.C. § 1801(b).

25.    Based on my knowledge, investigative experience, and research of voyeurism and/or voyeuristic investigations, acts of voyeurism frequently involve and/or include the following characteristics or traits:

a.    People engaged in voyeurism often surreptitiously photograph, videotape, film, digitally record, or by any other means secretly view, with or without a device, another person without that person's consent in circumstances such as in a restroom, bathroom, locker room, bedroom, or other location, where the person has a reasonable expectation of privacy.  Frequently, the person being viewed or recorded is urinating, defecating, dressing, undressing, nude, or involved in sexual intercourse or sexual contact.

b.    People engaged in voyeurism often surreptitiously photograph, videotape, film, digitally record, or by any other means secretly view, with or without a device, another person without that person's consent by "upskirting" or "downblousing," which are acts of strategically placing a recording device to view

genitals from below the opening of a skirt or down the shirt to record images of the female breasts.

26.     Additionally, I know there are certain characteristics common to individuals involved in the acquisition of voyeurism and/or voyeuristic materials, such as they:

        a.      May receive sexual gratification, stimulation, and satisfaction from contact with others who are unaware of the viewing or recordings; or from fantasies they may have viewing others engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media; or from literature describing such activity.

        b.      May collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, video recordings by electronic means or surreptitious recordings, books, slides and/or drawings or other visual media.  Such individuals oftentimes use these materials for their own sexual arousal and gratification.

        c.      Often possess and maintain their "hard copies" of pornographic or sexually explicit material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, books, tape recordings, mailing lists, erotica, and videotapes for many years.

        d.      Often maintain their collections that are in a digital or electronic format in a safe, secure, and private environment, such as a computer and

surrounding area.  These collections are often maintained for several years and are kept close by, usually at the individual's residence to enable the collector to view the collection, which is valued highly.

       e.    May correspond with and/or meet others to share information and materials; rarely destroy correspondence from other pornography or sexually explicit distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests.

       f.    Prefer not to be without their recordings, photographs, or documents, for any prolonged time.  (Based on my training and experience, this behavior has been documented by law enforcement officers involved in the investigation of voyeurism and/or voyeuristic tendencies throughout the world.)

27.    Based on the foregoing, I believe that there is probable cause to support that the Device contains evidence of the subject crime (i.e., video voyeurism), as well as evidence that corroborates ownership, use, and/or possession of the Device, how it was used and the purpose of its use, as well as depictions and/or evidence of voyeurism, including videos, recordings, photographs, digital literature, digital drawings, and/or pornographic images of voyeurism (e.g., nude or semi-nude photographs or videos that were taken or appear to have been taken surreptitiously). This may include depictions of a person's genitalia, buttocks, breasts, naked or

undergarment clad genitals, and/or private area of the individual, and depictions of people urinating and/or people defecating. Based on my knowledge and training, some additional paraphilia disorders, which are recurrent, intense, sexually arousing fantasies, urges, or behaviors that are distressing or disabling and that involve inanimate objects, children, or nonconsenting adults, or suffering or humiliation of oneself or the partner with the potential to cause harm, are associated with the behavior of people who engage in voyeurism.  Such behaviors include people who engage in coprophilia and urophilia. Coprophilia is abnormal interest and pleasure in feces and defecation, and urophilia or urolagnia is the sexual interest centered upon urine and urination. This might consist of observing others while they urinate, being urinated on during sexual activity, urinating on a sexual partner during sexual acts, or consuming one's own urine. Based on my training and experience, such depictions may be stored in a dedicated file for photographs and/or videos and/or may be (among other places on the phone) in text messages and/or emails.

28.    As further described in Attachment B, this application seeks permission to locate not only computer-like and electronic files on the phone that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes who used it.  Based on my training and experience, it is known that indicia of ownership and/or use is important in a criminal case.  Such information may help (among other things) corroborate ownership, use, and/or possession of the phone in question.  I am seeking permission to search for and seize indicia of

ownership and/or use of the phone.  Such indicia may include things such as JEAN's name used in conjunction with the phone (e.g., information in the contacts, texts, and emails) and/or specifically using JEAN's name and/or identifying him as the owner and/or user of the phone.  Indicia also may include subscriber information pertaining to the individual accounts and/or identifiers, including subscribers' full names, addresses, ESN (Electronic Serial Number), IMEI (International Mobile Station Equipment Identity), or other unique identifiers for the wireless device associated with the phone, telephone numbers utilized by the phone, and other identifiers associated with the phone.

29.    Additionally, I am seeking to search the "onboard" computer and processing systems incorporated in the cell phone, as such are important to criminal investigations because these items may have been used to collect and store information about the crime (in the form of electronic data).  Based on my knowledge, training, and experience, I know that searching and seizing information from computers and electronic devices that contain "onboard" computer systems and/or processing systems (such as cellular phones, smart phones, electronic communication devices, and similar electronic devices) often requires agents to seize the devices to be searched later by a qualified computer expert(s) in a laboratory or other controlled environment.  Some of the electronic records in such devices might take the form of files, documents, and other data that is user-generated.  Some of these electronic records, as explained below, might take a form

that becomes meaningful only upon forensic analysis.  Moreover, the co-mingling of electronic records stored within the "onboard" computer and processing systems, and the nature of the file extraction process used during forensic analysis, hinders the ability to narrow a search date window for evidence of crimes described above.

30.     Based on my knowledge, training and experience, electronic devices can store information for long periods of time. Similarly, things that have been viewed via the internet are typically stored for some period of time on devices. Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachments of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created. This information can sometimes be recovered with forensic tools.

31.     There is probable cause to believe things once stored on the Device may still be stored there, for at least the following reasons:

a.     Based on my knowledge, training, and experience, it is known that even when files have been deleted on cellular phones, they can be recovered months or years later using readily available forensics tools.  This is so because when

16

a person "deletes" a file the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.

b.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, that is, in space on the hard drive that is not currently being used by an active file for long periods of time before they are overwritten.  In addition, a cell phone's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.    Wholly apart from user-generated files, computer storage media – in particular, the devices' internal hard drives – contain electronic evidence of how the device has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer or electronic device users typically do not erase or delete this evidence, because special software is usually required for that task. However, it is technically possible to delete this information.

d.    Similarly, files that have been viewed via the internet are sometimes automatically downloaded into a temporary internet directory or "cache."

32.    The search methodology that may be employed in searching the Device, depending on the nature of the phone and its operating systems, is described as follows:

17

a.     The Device described in Attachment A, including all onboard computers, computer hardware, processing systems, and any form of electronic storage that could contain evidence described in the proposed warrant, will be seized to search for evidence as described above.  (Depending on the nature of the hardware, software, and/or processing system(s) used by the phone, such searches may be conducted offsite.)  It is anticipated that mirror copies or images of such evidence may be made – if possible and/or feasible – if the failure to do so could otherwise potentially alter the original evidence.

b.     Contextual information necessary to understand the evidence, to identify the user/possessor of the Device, to understand the operating and processing systems, and to establish admissibility of the evidence in subsequent legal proceedings will also be sought in the search.

c.     Additional techniques to be employed in analyzing the seized items may include (i) surveying various file directories and the individual files they contain; (ii) opening files to determine their contents; (ii) scanning storage areas, (iv) performing key word searches through all electronic records and storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in this affidavit and its attachments, and (v) performing any other data analysis techniques that may be necessary to locate and retrieve the evidence described in this affidavit and its attachments by whatever means necessary.

d.  As used above, the term "electronic data" includes all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

e.  Electronic data also includes contextual information necessary to identify the user/possessor of the device, as well as its operating systems and storage mediums.

f.  Unless further permission is sought from the Court, the Device described in Attachment A will be imaged (to the extent possible) and/or searched for the things described in Attachment B within the next 90 days. (In some cases, there may be difficulties in opening a phone due to security protocols or passwords. In such a case, additional time may be sought from the Court to access the devices.)

33.  Because this warrant seeks only permission to examine a device already in law enforcement possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, it is believed that there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

34.  The things to be searched for and seized are further described in Attachment B.[2]

---

[2] As set forth further in Attachment B, some of things to be searched for and seized from the Device are limited in time (to the extent possible), including for the time frames of October 1, 2022 (which was approximately the time JEAN was rehired by Xanterra) to

19

## Conclusion

35.     Based on the foregoing, I believe there is probable cause to support that the Device (as described in Attachment A) contains evidence of crimes, in violation of 18 U.S.C. § 1801.

36.     Thus, I respectfully request the issuance of a search warrant of the Device for the things specifically described in Attachment B.

**Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.**

Executed on: October_____, 2023

PHILIP OAKES  Digitally signed by PHILIP OAKES
Date: 2023.10.18 21:56:44 -07'00'
_____
Philip Oakes, Special Agent, NPS

_X_ Sworn by Telephone

Date/Time: __October 19, 2023 at 1:25 p.m._____

_____
Camille D. Bibles
United States Magistrate Judge

_____

October 8, 2023 (which was when the instant incident occurred).  However, some of the things to be searched for and seized are not time limited such as indicia of ownership, use, and/or possession of the Device, as well as evidence of voyeurism (which is evidence that supports the instant offense as well as his intent and knowledge of voyeurism).